UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTH CAPITOL BRIDGEBUILDERS,<br><br>*Plaintiff,*<br><br>v.<br><br>**LEXINGTON INSURANCE COMPANY,**<br><br>*Defendant.* | Case No. 1:21-cv-1436-RCL |

## MEMORANDUM OPINION

This case involves a breach-of-contract dispute between plaintiff South Capitol Bridgebuilders ("SCB") and defendant Lexington Insurance Company ("Lexington"). SCB moves to compel the production of several documents that Lexington has withheld during discovery, citing the attorney-client and work-product privileges. Pl.'s Mot., ECF No. 44.[1] Lexington opposes, Def.'s Opp'n, ECF No. 47, and SCB filed a reply, Pl.'s Reply, ECF No. 48. Upon an initial review of the parties' filings, the Court concluded that its determination would be aided by viewing the documents *in camera*. ECF No. 49. Lexington delivered the withheld documents to the undersigned's chambers for review *in camera*. ECF No. 50. SCB's motion is now ripe for review.

Upon consideration of the parties' filings, ECF Nos. 44, 47, 48, 50, the documents at issue, applicable law, and the entire record, the Court will **GRANT IN PART** and **DENY IN PART** SCB's motion to compel.

---

[1] SCB amended its initial motion to compel. *See* ECF Nos. 43, 44. The amended motion is the operative pleading, so the Court will **DISMISS AS MOOT** the initial motion to compel.

1

## I. BACKGROUND

SCB is a single-purpose joint venture comprised of Archer Western Construction, LLC and Granite Construction Company. Compl. 1, ECF No. 1 Its purpose is to build the Fredrick Douglass Memorial Bridge in the District of Columbia. *Id.* ¶¶ 1, 14, ECF No. 1. Construction began in the summer of 2017. *Id.* ¶ 22. In advance of beginning construction, SCB procured a builder's risk insurance policy (the "Policy") issued by Lexington. *Id.* ¶ 2.

As part of the construction process, SCB poured concrete into molds for the components to be used in constructing the bridge. *See id.* ¶ 20. Around September 2019, SCB discovered that the dried cement contained "honeycombing" and "voiding"—essentially, unwanted pockets of air. *Id.* ¶¶ 26–29. Honeycombing "results in weakness in the concrete and caused the structures to be insufficient to meet the load requirements . . . of . . . the Bridge." *Id.* ¶ 27. Because the structural integrity of the concrete components had been undermined by honeycombing and voiding, the components required extensive repairs. *Id.* ¶ 31–32.

On October 24, 2019, SCB filed a claim with Lexington for the repair costs. *See* Decl. of John A. Catania ("Catania Decl."), ECF No. 47-1. The claim was assigned to John A. Catania of AIG Claims.[2] *Id.* ¶ 2. Mr. Catania retained Charles Klehr of Charles Taylor Adjusting to serve as an outside insurance adjuster and DeSimone Consulting Engineers ("DeSimone") to assist with investigating the claim. *Id.* ¶¶ 2–3. Mr. Klehr and personnel at DeSimone—including DeSimone engineers—visited the Bridge's location in the District and conducted a factual investigation of the damage. *See id.* ¶¶ 3–5. On February 18, 2020, DeSimone issued a report concluding that

---

[2] Lexington Insurance Company is an affiliate of AIG and is a direct, wholly owned subsidiary of AIG Property Casualty U.S., Inc. *See* ECF No. 19.

SCB's workmanship—specifically, SCB's failure to properly vibrate the molds while concrete was being poured—was the most likely cause of the defects. *Id.* ¶ 5; ECF No. 1-2 at 12–13.

Mr. Catania stated that after he reviewed the DeSimone report, he believed that SCB's claim did not appear to be covered by the Policy, that "SCB was likely to dispute a declination of coverage," and that such a dispute was likely to result in litigation. *Id.* ¶ 6. Accordingly, Mr. Catania retained Steptoe & Johnson LLP ("Steptoe") "for purposes of having Steptoe provide legal advice as to whether SCB's claim was within coverage." *Id.* ¶ 7. Steptoe did not conduct any factual investigation, but reviewed the relevant materials prepared by Charles Taylor and DeSimone and prepared written advice for Mr. Catania and a draft letter to SCB. *Id.* ¶ 8. Mr. Catania shared these materials with his direct and indirect supervisors, Mark Handy and John Roberts. *Id.* ¶ 9. Mr. Catania ultimately denied coverage of SCB's claim, which he conveyed in a letter dated April 9, 2020. *Id.* ¶ 10. After receiving a request for reconsideration, Lexington stood by its initial decision denying coverage. *Id.*

SCB filed this lawsuit shortly thereafter in the Northern District of Illinois. *See* Compl. SCB filed a motion to compel production of several withheld documents, ECF No. 32, which Judge Mary M. Rowland in the Northern District of Illinois denied upon granting Lexington's motion to transfer the case to this District, ECF Nos. 39, 40.

After the case was assigned to the undersigned, SCB again moved to compel production of several documents. Pl.'s Mot. Almost all these documents—emails and attachments that Lexington claims are protected from disclosure by the attorney–client privilege and work-product doctrine—were created after Mr. Catania retained Steptoe but before Lexington issued its coverage decision. Lexington filed an opposition, Def.'s Opp'n, and SCB replied, Pl.'s Reply. Upon an

3

initial review of the parties' filings, the Court ordered defendant to produce the withheld documents for *in camera* review. ECF No. 49. SCB's motion to compel is ripe for consideration.

## II. LEGAL STANDARD

"When a party objects to a request for production of documents under Federal Rule of Civil Procedure 34(a)(1), the requesting party may move for an order compelling disclosure of the withheld material." *Felder v. Wash. Metro. Area Transit Auth.*, 153 F. Supp. 3d 221, 224 (D.D.C. 2015) (citing Fed. R. Civ. P. 37(a)). The movant "bears the initial burden of explaining how the requested information is relevant." *Jewish War Veterans of the United States of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 42 (D.D.C. 2007). "The burden then shifts to the non-moving party to explain why discovery should not be permitted." *Long v. Motion Picture Ass'n of Am.*, No. 19-cv-2088 (CRC), 2021 WL 5446278, at *2 (D.D.C. Nov. 22, 2021) (quoting *Felder*, 153 F. Supp. 3d at 224). "If a party has withheld documents on the grounds that they are privileged, the withholding party 'bears the burden of proving the communications are protected.'" *Id.* (quoting *Felder*, 153 F. Supp. 3d at 224).

## III. DISCUSSION

For the reasons set forth below, the Court will **GRANT IN PART** and **DENY IN PART** SCB's motion to compel. SCB argues that the withheld materials are relevant because they go to "Lexington's handling of SCB's claim—i.e., the nature and substance of the investigation, assessment and analysis that led to Lexington's decision that led to deny the claim." Pl.'s Mot. 3. SCB has met its burden to explain the relevance of the withheld materials. Thus, the burden shifts to Lexington to explain why discovery should not be permitted. The Court will address Lexington's attorney–client privilege and work-product privilege claims in turn. The Court's holdings and analysis will cite to the relevant documents by their privilege log numbers. *See* ECF No. 44-6.

4

### A. Attorney Client Privilege

*1. The Court Will Apply Illinois Law to Attorney–Client Privilege Issues*

The parties agree that the attorney–client privilege disputes in this case implicate matters of state law. *See* Pl.'s Mot. 9; Def.'s Opp'n 5–6; *see also* Fed. R. Evid. 501. Accordingly, the Court begins its analysis by determining the applicable state's choice-of-law rules. The Supreme Court has held that where defendants seek transfer under 28 U.S.C. § 1404(a), "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). In this case, defendants moved for—and were granted—transfer from the Northern District of Illinois pursuant to § 1404(a). *See* ECF Nos. 16 & 39. Thus, the Court must apply the choice-of-law rules that would be applied by the Northern District of Illinois. A federal court applies the choice-of-law rules applied by the courts of the state in which it sits. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Because the Northern District of Illinois would have applied Illinois choice-of-law rules, this Court will also apply Illinois choice-of-law rules.

Illinois courts engage in choice-of-law analysis only "if there is a conflict between Illinois law and the law of another state such that a difference in law will make a difference in the outcome." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (internal quotation marks and citation omitted); *accord Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007). Otherwise, the court applies the law of the forum state. *See Bd. of Forensic Document Examiners*, 922 F.3d at 831. The party seeking a choice of law determination bears the burden of "establish[ing] the existence of an outcome-determinative conflict." *Id.* (quoting *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017)). Defendant acknowledges that "there is no apparent outcome-determinative difference between Illinois law and District of Columbia law with respect to attorney-client privilege." Def.'s

5

Opp'n 6. Both parties apply Illinois law in their filings. Accordingly, the Court will apply Illinois law regarding attorney–client privilege. *See W. Side Salvage*, 878 F.3d at 223 (citing *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014)) ("If the party fails to establish the existence of such a conflict, the court applies the law of the forum state.").

*2. Existence of an Attorney–Client Relationship*

For the attorney–client privilege to apply, there must be an attorney-client relationship. In the corporate setting, Illinois courts apply the "control group" test to determine which employees qualify as the "client," so communications between an attorney and those employees will qualify for the privilege's protection. *See, e.g.*, *Favala v. Cumberland Eng'g Co.*, 17 F.3d 987, 989 (7th Cir. 1994); *Gibson v. Chubb Nat'l Ins. Co.*, No. 20-CV-1069, 2021 WL 4401434, at *5 (N.D. Ill. Sept. 27, 2021). At its core, this test focuses on the status of the employee within the corporate hierarchy and asks whether she is in a position to control or play a substantial role in a decision for which the corporation might rely upon an attorney's advice. *See Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250, 255 (Ill. 1982). Because the underlying relationship between a corporate client and its employee is one of principal and agent, the control-group analysis may sometimes accommodate non-employee agents working within the scope of their authority. *See Caremark, Inc. v. Affiliated Comp. Servs., Inc.*, 192 F.R.D. 263, 267 (N.D. Ill. 2000).

Under Illinois law, two categories of individuals fall within the control group. The first category includes the decisionmakers and top management with authority to control the relevant action. *See Consolidation Coal Co.*, 432 N.E.2d at 257. The second category includes "employee[s] whose advisory role to top management in a particular area is such that a decision would not normally be made without [their] advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority." *Id.* at 258. But individuals who

merely play a role in *supplying* information to others in these categories do not fall within the control group. *Id.* For example, an individual "is not in the control group if his 'role was one of supplying the factual bases upon which were predicated the opinions and recommendations of those who advised the decisionmakers.'" *Favala*, 17 F.3d at 990 (quoting *Consolidation Coal*, 432 N.E.2d at 258). The party asserting the privilege bears the burden of proving that an individual falls within the control group. *Id.* (citing *Consolidation Coal*, 432 N.E.2d at 257).

"It is well-settled that distribution of otherwise privileged materials to individuals outside the corporation's control group destroys the privilege." *Gibson*, 2021 WL 4401434, at *5 (cleaned up); *see Midwesco-Paschen Joint Venture for Viking Projects v. Imo Indus., Inc.*, 638 N.E.2d 322, 329 (Ill. App. Ct. 1994). That is because each communication protected by the attorney–client privilege must "originate[] in a confidence that it would not be disclosed . . . and remain[] confidential." *Favala*, 17 F.3d at 990 (quoting *Consolidation Coal*, 432 N.E.2d at 257). Disclosure outside of the control group terminates this required confidentiality.

Several persons identified by Mr. Catania in his declaration are "decisionmakers" that clearly fall within the control group. These are Mr. Catania himself, Mr. Handy, and Mr. Roberts. Mr. Catania explains that "[a]s the claims professional assigned to the SCB claim, [he] had authority to deny coverage on behalf of Lexington with [his] manager's approval." Catania Decl. ¶ 10. His direct and indirect supervisors were Messrs. Roberts and Handy. *Id.* ¶ 9. In its reply, SCB acknowledges as much. Pl.'s Reply 8. All three are members of the control group.

Mr. Klehr and personnel from DeSimone are not members of the control group. Lexington argues that these individuals "were the personnel on which Mr. Catania relied for the factual materials that informed his decision to deny SCB's claim." Def.'s Opp'n 12. That is true. But merely supplying information or the factual bases upon which control group members relied for

their decision does not bring the supplying individual within the control group. *See Consolidation Coal*, 432 N.E.2d at 258. The Court agrees with SCB that Lexington has provided no information that Mr. Klehr or DeSimone personnel played any role in assessing coverage for SCB's claim by *evaluating* the information they gathered. *See* Pl.'s Reply 9. Accordingly, the Court concludes that these individuals are not members of the control group and disclosure to them waives any claim of privilege.

AIG's in-house counsel Ann O'Connor presents a more difficult issue. While SCB is correct that Ms. O'Connor's title does not, without more, establish that she was part of the control group, her title as in-house counsel *is* relevant evidence that she may be the type of individual "whose advisory role to top management in a particular area is such that a decision would not normally be made without h[er] advice or opinion." *Consolidation Coal Co.*, 432 N.E.2d at 258; *see Dawson v. N.Y. Life Ins. Co.*, 901 F. Supp. 1362, 1367 (N.D. Ill. 1995) (concluding that corporation's general counsel falls within the control group); ECF No. 44-6 at 5 (listing Ms. O'Connor's position). Mr. Catania's declaration does not mention Ms. O'Connor by name. But after receiving legal advice with a recommendation about how to proceed, Mr. Catania explains that he "shared Steptoe's coverage opinion with . . . [his] direct and indirect supervisors . . . to ensure that there was consensus support for [his] decision." Catania Decl. ¶ 9. Ms. O'Connor is copied on these specific communications and the responses from Steptoe. ECF No. 44-6 at 4. And as the privilege log reflects, Mr. Catania "comment[ed] on [Steptoe's] legal advice" and "request[ed] additional legal analysis." *Id.* The Court's *in camera* review confirms that these are exactly the type of communications on which a corporate actor may rely on the opinions of in-house counsel. Based on Ms. O'Connor's job title and the circumstances of these communications—as detailed in Mr. Catania's declaration and confirmed by the Court's *in camera*

8

review—it is plausible to infer that Ms. O'Connor falls within the control group, that is, as someone "upon whose opinions and advice the decision-makers rely." *Dawson*, 901 F. Supp. At 1367 (citing *Consolidation Coal*, 432 N.E.2d at 257–58).

The remaining issues are whether the lack of detail in Mr. Catania's declaration about Ms. O'Connor's specific role in the SCB coverage determination and the absence of any communications from Ms. O'Connor herself are fatal to Lexington's privilege claim. *See* Pl.'s Reply 8. They are not. There appears to be some divergence in the caselaw on whether a party asserting privilege must show that the recipient *actually* participated in the decision-making process. *Compare Mlynarski v. Rush Presbyterian-St. Luke's Med. Ctr.*, 572 N.E.2d 1025, 1028–29 (Ill. App. 1991) ("The extent to which Goldsberry participated in the decision-making process, the nature of her opinions, . . . and the weight given her opinions should themselves be subject to inquiry."), *with Claxton v. Thackston*, 559 N.E.2d 82, 86 (Ill. App. 1990) (framing inquiry as whether individual's "opinion *would* in fact form the basis for any decision by others with authority in the company" (emphasis added)). But in the absence of additional binding authority by the Illinois Supreme Court, the Court is not persuaded that the narrower reading of *Consolidation Coal* is the correct one. As another court has explained:

> The [Illinois Supreme] Court was not advocating an *ex post* analysis, under which the application of the privilege is determined by whether "top management" actually relied in the particular situation on the advice of those whose function it is to give it. Rather, the proper inquiry is *whether the views of a particular advisor or group of advisors are usually factored into management's decisions*. The Court stressed that this approach is in accord with modern corporate realities and recognizes that decision-making within a corporation is a process rather than a final act.

*Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1004, 1011 (N.D. Ill. 2014) (emphasis added). Indeed, the Illinois Supreme Court focused its inquiry on the "status" of the particular employee to

determine whether the communication is protected from disclosure. *See Consolidation Coal*, 432 N.E.2d at 258. Here, the Court concludes, based on Ms. O'Connor's title and the circumstances of the communications at issue, that Ms. O'Connor is one whose opinions would "usually factor" into top-management's decisions. Ms. O'Connor is a member of the control group.

Mr. Catania's declaration is silent about Eric Zimmerman's role in the decision-making process. All that appears in the privilege log is Mr. Zimmerman's title—"Builders Risk & Construction Property Head (US)." ECF No. 44-4 at 5. But unlike Ms. O'Connor's title as in-house counsel, Mr. Zimmerman's title tells the Court nothing about the role he played in the decision-making process. Nor did the Court find any evidence during its review *in camera* from which it may draw an inference that Mr. Zimmerman was one of the decision-makers or an individual who directly advises top management. The absence of any information about Mr. Zimmerman's role in the decision-making process is fatal to Lexington's claim of privilege. Disclosure to Mr. Zimmerman thus breaks confidentiality and such communications must be produced in discovery.

In summary, members of the control group include Mssrs. Catania, Handy, Roberts, and Ms. O'Connor. Mssrs. Klehr and Zimmerman, as well as DeSimone personnel, are not members of the control group. Communications between control group members and Steptoe attorneys may be protected by the attorney-client privilege, provided the remaining attorney-client privilege requirements are satisfied. Accordingly, privilege log item numbers 1, 6, 7, 8, 10, and 20 are not protected by the attorney–client privilege because they involve disclosures to persons outside of the control group.

### 3. *Existence of Privileged Information*

Having determined which individuals constitute the "client" for purposes of the attorney–client privilege, the Court must next determine what information is protected by the privilege. In Illinois, "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal adviser, [unless] the protection [is] waived." *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 727 N.E.2d 240, 243 (Ill. 2000) (citing *In re Himmel*, 533 N.E.2d 790 (Ill. 1988)). "Attorney-client privilege extends to both communication from client to attorney, as well as from attorney to client." *Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 563 (N.D. Ill. 2007) (citing *Midwesco-Paschen Joint Venture for Viking Projects*, 638 N.E.2d at 327). Nevertheless, Illinois also maintains a "strong policy of encouraging disclosure," so the privilege is construed "within its narrowest possible limits." *Ill. Emcasco Ins. Co. v. Nationwide Mut. Ins. Co.*, 913 N.E.2d 1102, 1105 (Ill. App. 2009) (quoting *Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322, 327 (Ill. 1991))). The Court finds that the remaining documents at issue—those that do not involve a waiver by disclosure outside of the control group—are protected by the attorney–client privilege. Similarly, almost all the entries in the redaction log are protected by the privilege.

In Illinois, the privilege applies only to "legal advice" or communications related to that purpose. *Fischel & Kahn*, 727 N.E.2d at 243. Generally speaking, "legal advice, as contrasted with business advice, 'involves the interpretation and application of legal principles to guide future conduct or to assess past conduct.'" *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018) (quoting *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)). SCB argues that Steptoe did not "render[] legal advice" to defendant, but instead

11

"engaged in the business function of investigating and analyzing SCB's claim for the purpose of making a coverage determination." Pl.'s Mot. 8–9. In response, Lexington argues that Steptoe's role was "to provide legal advice to Lexington regarding whether the facts, as developed in an investigation in which Steptoe had no role, gave rise to a covered claim." Def.'s Opp'n 9–10.

Several federal courts have applied Illinois attorney–client privilege law in the insurance context. The "general rule is that communications between an insurer and its outside coverage counsel" may also be protected by attorney–client privilege provided that the other requirements applied by Illinois courts are satisfied. *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 794 (N.D. Ill. 2015) (citing *Ill. Emcasco Ins. Co.*, 913 N.E.2d at 1106). This means that the attorney must be acting in his capacity as a lawyer; "to the extent that an attorney acts as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney/client privilege does not apply." *Id.* (citation omitted); *Chicago Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 WL 172148, at *3 (N.D. Ill. Apr. 10, 1996).

SCB's submissions do not illuminate Steptoe's role. Lexington's privilege log, which repeatedly describes the need for "legal advice regarding coverage issues presented by SCB's claim," *see* ECF No. 44-6 at 1–4, is largely conclusory. John Catania's declaration is more helpful. Mr. Catania describes how, after factual investigation of plaintiff's claim was complete, "Steptoe provided written legal advice to [him] regarding whether the SCB claim was within the coverage of the Policy, as well as a draft letter to SCB." Catania Decl. ¶ 8. These additional details support Lexington's argument that Steptoe was not involved in the factual investigation of the claim or the adjusting process. And interpreting contracts—like the Policy—is a quintessential instance of legal work.

12

But any lingering ambiguity stems from a line-drawing issue: is applying the Policy's provisions to SCB's claim the job of a lawyer, or claims adjuster? To the extent that this question might pose challenges in the abstract, the Court's *in camera* review confirms that Steptoe served as a legal advisor with no authority to make a final decision in connection with SCB's claim. Indeed, many of the emails and documents are like those in *Slaven*, so the Court is instructed by the analysis there. The clearest examples of Steptoe's role as a legal advisor are its memoranda. (Privilege Log Nos. 15, 17, 19, 20.) Steptoe conducted no factual investigation of its own. Instead, Steptoe relied on the materials created during DeSimone's investigation or other documents provided to plaintiff in discovery (or to which plaintiff already has access, like the Policy itself). Steptoe's memoranda contain "purely legal assessment[s]" of SCB's claim, *Slaven*, 83 F. Supp. 3d at 802, and discuss governing law, analogize to caselaw, and interpret the Policy's provisions. Finally, the memoranda provide recommendations to defendant. Crucially, they do not purport to adjust SCB's claim, but instead provide Steptoe's "opinion[s]" about the Policy's terms. *Id.* Such memoranda are prototypical examples of a lawyer's work for a client.

Drafts of the letter ultimately sent from Mr. Catania to SCB also implicate Steptoe's role as a legal advisor. (Privilege Log Nos. 15, 17, 19, 20.) These drafts—sent before Mr. Catania had reached a final decision to convey the denial—accompanied the memoranda and thus were part and parcel of Steptoe's legal advice. Such letters "were prepared by the lawyers for their client in the pursuit of their providing legal services and are thus protected from disclosure." *Slaven*, 83 F. Supp. 3d at 802; *cf. BankDirect*, 326 F.R.D. at 183–84 (analyzing under federal privilege).

The factual investigation materials generated by Charles Taylor and DeSimone—which are attached to several email communications sent to Steptoe—are not protected by the attorney-client privilege because they were generated in the ordinary course of investigating SCB's claim.

13

*See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 138 (N.D. Ill. 1993); *Chicago Meat Processors*, 1996 WL 172148, at *3 ("[T]he factual results of such an investigation are discoverable in cases challenging the denial of the claim, to the same extent as if such factual investigation were conducted by its own adjusters or claims department."). But Lexington does not dispute this and has represented that these materials have already been disclosed during the discovery process. Lexington has only withheld them in conjunction with the communications sent to Steptoe.

So the Court turns next to the withheld emails. The Court's *in camera* review confirms that the emails sharing or discussing the memoranda and draft letters fall within the ambit of the privilege because they either convey legal advice or are related to this purpose. And while the attachments themselves are not privileged, the emails to Steptoe conveying factual information, like the DeSimone reports, also satisfy this particular requirement. This is because "[a] communication disclosing non-privileged information to an attorney might be privileged on the grounds that the fact of disclosure has its own, independent significance. The goal is to protect not the underlying information, but the significance implicit in the fact that the client chose to communicate that information to his attorney." *Jentz v. ConAgra Foods*, No. 10-CV-0474-MJR-PMF, 2011 WL 5325669, at *4 (S.D. Ill. Nov. 3, 2011). These communications were integral to the Steptoe's role as an attorney-advisor and thus are protected by the privilege.

Finally, the Court turns to Lexington's redaction log.[3] It is true that Lexington's explanations for its redactions are barebones, stating only that these notes "reflect[] legal advice

---

[3] In its opposition, Lexington expresses its understanding that SCB is not seeking the unredaction of Lexington's reserves (liabilities) information and argues that, in any event, such information is protected from discovery and not relevant to the dispute. Def.'s Opp'n 15. Neither SCB's motion nor its reply mention this reserves information or argue that the information is relevant as required to compel disclosure. *See Felder*, 153 F. Supp. 3d at 224 (citing Fed. R. Civ. P. 37(a)). This argument is forfeited.

of outside counsel detailed in [Lexington's] privilege log." ECF No. 44-6 at 5. And as SCB argues, Lexington makes no effort to match the entries in its redaction log to the communications or withheld documents listed in its privilege log. Pl.'s Mot. 7. Additionally, several redacted entries are categorized only as "General," rather than "Litigation." *See* ECF No. 44-2. But despite Lexington's shortcomings here, the Court's *in camera* review confirms that *almost* all these entries reflect quintessential attorney–client communications. For example, and without divulging details, several entries reflect discussions between Mr. Catania and Steptoe regarding actions taken during in this litigation. Other entries have no corresponding document in the privilege log—or apparently correspond to several communications, both privileged and unprivileged. Nevertheless, these entries reflect the information that was exchanged between Mr. Catania and Steptoe as part of the representation. Because these communications implicate legal advice or are related to that purpose, they are protected by the privilege. *Fischel & Kahn*, 727 N.E.2d at 243. And an entry by Ms. Wiltz—an AIG claims assistant—reflects billing information between AIG and Steptoe. Even if Ms. Wiltz falls outside of the control group for purposes of this specific communication, this information cannot lead to the discovery of relevant information for SCB's claims or defenses.

The only communication that does not appear to be "legal advice" or strictly related to this purpose under Illinois law is the redaction for February 26, 2020. ECF No. 44-2 at 5. This redaction instead reflects a communication between Mr. Catania and Mr. Roberts authorizing Mr. Catania to engage Steptoe. While this communication does reflect the scope of Steptoe's role, the Court is not convinced that Lexington has satisfied its burden as to this communication in light of the Illinois Supreme Court's instruction that the privilege should be construed within its narrowest possible limits. *Waste Mgmt.*, 579 N.E.2d at 327.

The Court holds that the remaining documents—those that do not involve a waiver due to disclosure outside of the control group—are properly withheld under the attorney–client privilege. The Court also holds that Lexington's redactions may be properly withheld under the privilege, with the exception of the entry on February 26, 2020.

### B. Work-Product Doctrine

Lexington also claims that most of the withheld documents at issue here are shielded by the work-product doctrine. The work-product doctrine is a principle of federal law. *See, e.g., Hickman v. Taylor*, 329 U.S. 495 (1947); *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 148 (D.C. Cir. 2015); Fed. R. Civ. P. 26(b). Accordingly, the *Van Dusen* rule does not apply and the Court's determination is governed by federal law as developed in this Circuit. *See, e.g., In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987); 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3846 (4th ed.).

The work-product doctrine protects parties from divulging information used to prepare for litigation. As the Federal Rules of Civil Procedure state:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

Fed. R. Civ. P. 26(b)(3)(A). Rule 26(b)(3) allows a court to order disclosure when the requesting party can show a "substantial need" for the material and an inability to procure equivalent information "without undue hardship." Fed. R. Civ. P. 26(b)(3)(A)(ii). But a court ordering disclosure under this provision must nevertheless "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative

16

concerning the litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 135 (D.C. Cir. 2010) (quoting Fed. R. Civ. P. 26(b)(3)(B)).

Because the Court has already held that several documents may be properly withheld under the attorney–client privilege, the Court will focus its analysis on the remaining documents that are not protected by the attorney–client privilege. Here, SCB does not dispute that many of the withheld documents contain the mental impressions, conclusions, opinions, and legal theories of Steptoe attorneys. Instead, SCB disputes whether the withheld documents were prepared in anticipation of litigation. Pl.'s Mot. 13–14.

To determine whether a document was prepared in anticipation of litigation, the D.C. Circuit, like most circuits, asks whether a particular document was created "because of" the anticipated litigation. *See Deloitte*, 610 F.3d. at 136. First, the attorney who created the document must have "had a subjective belief that litigation was a real possibility," and that belief must have been "objectively reasonable." *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for United States Att'ys*, 844 F.3d 246, 251 (D.C. Cir. 2016) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)). Next, the Court must ask "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Deloitte*, 610 F.3d at 137 (quoting *In re Sealed Case*, 146 F.3d at 884). Notably, "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status." *Id.* at 138. But if a document would have been created "in substantially similar form" regardless of the litigation, work product protection is not available. *Boehringer Ingelheim Pharms.*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138). The D.C. Circuit does not require a showing that the "primary motivating purpose" behind the document was to aid in litigation. *Deloitte*, 610 F.3d at 138.

Mr. Catania's subjective belief that litigation could result from the denial of coverage is undisputed on the present record. His declaration states that upon receiving DeSimone's report, he concluded that SCB's claim did not appear to be covered and that SCB would likely dispute the declination in coverage. Catania Decl. ¶ 6. He believed that "the dispute would likely result in litigation." *Id.*[4]

Whether that belief was objectively reasonable is more a difficult question—but more importantly, one that the Court need not answer to resolve Lexington's privilege claims. Lexington relies solely on the monetary value of SCB's formal claim as evidence that a coverage dispute would likely result in litigation. *See* Def.'s Opp'n 14. The Court agrees that the value of SCB's claim *is* relevant evidence that SCB might file a lawsuit if its claim was denied. But even expensive disputes may be resolved outside of the federal courts. Lexington's evidence of likely litigation is a far cry from other cases with "the hallmarks of a pre-litigation dispute," such as evidence of "an adverse and antagonistic relationship" between the parties. *Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 249 (D.D.C. 2013).[5]

Ultimately, these problems focus the Court's analysis on the dispositive issue for Lexington's work-product privilege claims. Here, Lexington has failed to meet its burden to show that the remaining withheld documents "can fairly be said to have been prepared or obtained because of the prospect of litigation." *Deloitte*, 610 F.3d at 137. Indeed, despite Mr. Catania's statement that he believed SCB's claim might not be covered, it is undisputed that Lexington was *continuing to evaluate* that position, which is why it engaged Steptoe. Thus, as far as the Court

---

[4] Notably, Lexington provides no information about the Steptoe attorneys' beliefs. For the reasons explained below, this does not affect the outcome here.

[5] It is possible that Mr. Catania's tentative decision to deny coverage, in light of Steptoe's early advice, increased the probability that the case would ultimately result in litigation. But as noted, the Court need not resolve whether Lexington's beliefs were objectively reasonable to adjudicate the present motion.

can tell from the privilege log and *in camera* review, the coverage memoranda would have been created "in substantially similar form" regardless of the prospect of litigation, because Lexington nevertheless needed to determine whether the Policy covered SCB's claim. *Boehringer Ingelheim Pharms.*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).[6] The emails transmitting factual information also likely would have existed in substantially similar form, regardless of the prospect of litigation, because they served the same goal of determining coverage. The lack of additional facts about the likelihood of litigation reinforces the Court's conclusion. If Lexington could identify additional facts suggesting an objectively reasonable likelihood of litigation, perhaps the Court could have tied the contents of the withheld materials to those facts. Lexington did not do so. In fact, Lexington failed to address this requirement at all in its briefing, and thus forfeited any potential arguments that the withheld documents were "prepared or obtained because of the prospect of litigation." *Deloitte*, 610 F.3d. at 137.

Accordingly, the Court finds that the remaining documents not protected by the attorney–client privilege—Privilege Log Nos. 1, 6, 7, 8, 10, and 20, and the Redaction Log entry for February 26, 2020—are also not protected by the work-product privilege.

## IV. CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** the motion to compel by separate order. Privilege Log Nos. 1, 6, 7, 8, 10, and 20, and the Redaction Log entry for February 26, 2020, must be disclosed to SCB because Lexington has failed to meet its burden to withhold the documents under the attorney–client or work-product privileges. The

---

[6] While Lexington does not make the argument, the governing law sections of the memoranda ask what law a court would apply if the coverage denial ultimately resulted in a lawsuit. The Court is not convinced that this section indicates the memoranda were prepared in anticipation of litigation. A memorandum interpreting the Policy's provisions would need to engage in this same analysis in order to interpret the Policy.

remaining privilege log items and redactions may properly be withheld under the attorney–client privilege.

Date: __2-14-22__

*Royce C. Lamberth*
Royce C. Lamberth
United States District Judge