**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| SOUTH CAPITOL BRIDGEBUILDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:21-cv-01436-RCL |
| v. ) | |
| ) | Honorable Royce C. Lamberth |
| LEXINGTON INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(a) and Federal Rule of Civil Procedure 56, Plaintiff South

Capitol Bridgebuilders ("SCB") submits this memorandum in support of its motion for partial

summary judgment as to Count I of the complaint, filed concurrently herewith.[1]

## INTRODUCTION

This is an insurance coverage dispute arising from SCB's construction of the new Frederick

Douglass Memorial Bridge in Washington, D.C. Lexington issued to SCB a "completed value"

builder's risk policy, through which it agreed to indemnify SCB against all risks of direct physical

loss or damage to the new bridge during, or in the course of, construction. The all-risk insuring

agreement excluded coverage for loss or damage caused by defects in workmanship. However,

SCB purchased an extension of coverage, the "LEG 3 Defect Extension" endorsement, that

modified the insurance policy, significantly narrowing the scope of the exclusion for damage

caused by workmanship defects. Under the LEG 3 extension, the cost of replacing or repairing

---

[1] The instant motion does not address SCB's bad faith claim (Count II), as discovery relevant to that claim
is the subject of a pending discovery motion. *See* ECF 56.

1

patent detrimental damage to the structure under construction caused by defective workmanship is expressly covered, and only the cost of *improving* defective workmanship is excluded.

The relevant facts are undisputed: In the course of constructing load-bearing elements of the new bridge, namely the West Abutment and North and South V-Pier 1s, a defect in workmanship caused substantial voids to form within certain portions of concrete. The affected portions of concrete were appended to previously constructed sections of the abutment and V-piers to form a single, continuous structure. While the abutment and V-piers were constructed in stages, all portions of the structure were internally connected with steel rebar and 60-inch diameter pipes. Prior to the defective pours, the unfinished abutment was carrying the weight of the bridge. After the flawed concrete was appended to the existing load bearing sections of the bridge, however, the structure was no longer able to support the weight of the bridge, and SCB was forced shore the structures to prevent collapse and undertake repairs costing more than $2.2 million.

Nonetheless, Lexington has denied coverage, asserting that: (1) no damage to covered property occurred because the abutment and V-piers were not yet "placed into use" or "incorporated into non-defective components" and (2) the LEG 3 extension bars coverage, without exception, for damage caused by workmanship defects. Neither of these contentions can be reconciled with the plain language and purpose of the Policy or the undisputed facts. As set forth below, the Policy covers physical damage to the bridge at any stage of completion. There is no requirement that, to be covered, the damaged portion must be "placed into use" or "incorporated into" other structures—although, in fact, these structures *were* incorporated into other structures and placed into use as load-bearing structures. And through the LEG 3 extension, the parties agreed to narrow the scope of the exclusion for damage caused by defects in workmanship, providing that

only the cost of improving defects in workmanship would be excluded from coverage.[2] Thus, Lexington's coverage position is unmoored from the purpose and plain language of the policy, as well as the facts surrounding the loss, and SCB is entitled to judgment as a matter of law.

## LEGAL STANDARDS

### I.    Governing Law

Illinois law governs this insurance coverage dispute.[3] A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Sosa v. Onfido, Inc.,* 8 F.4th 631, 637 (7th Cir. 2021) (citation omitted). When a case is transferred from one district court to another, as this one was, the transferee court applies the transferor court's choice of law rules. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986). Accordingly, Illinois choice of law rules apply.

To determine the substantive law applicable to an insurance coverage dispute, "Illinois courts employ a 'most significant contacts' test." *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). Applying that test, the court considers several factors, including "the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance,

---

[2] SCB's claim does not include the cost of such improvements.

[3] SCB believes that Illinois law governs, as explained in this section. However, SCB is entitled to summary judgment under D.C. law, as well. The sole salient difference between Illinois and D.C. law is that Illinois law requires the entire insurance policy to be construed in favor of the insured, whereas under D.C. law, only ambiguous policy provisions must be construed in the insured's favor. *Compare DeSaga v. W. Bend Mut. Ins. Co.*, 391 Ill. App. 3d 1062, 1066, 910 N.E.2d 159, 164 (2009) ("Insurance policies are to be liberally construed in favor of the insured … and in favor of coverage ….") (citations omitted) *with Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996) (absent ambiguity, insurance policy will be enforced as written unless it violates a statute or public policy). Here, the relevant policy provisions unambiguously provide coverage for the claimed loss, as set forth below (Argument Part I, *infra*). To the extent the Policy, as amended by the LEG 3 extension, lends itself to two reasonable interpretations—i.e., is ambiguous—both Illinois and D.C. law require a ruling in SCB's favor. *See FDIC v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404, 408 (7th Cir. 1993) (Illinois law); *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001).

or other place bearing a rational relationship to the general contract." *Id.* (citing *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 527 (1995)).  Here, the subject matter of the insurance contract is located in the District of Columbia, one of the insureds is domiciled in California, and the insurer is domiciled in Delaware and Massachusetts. St. ¶¶ 3, 5, 17-18. All other relevant contacts are with Illinois: The contract was negotiated in and delivered to SCB in Illinois, SCB performed its obligations under the contract in Illinois, and the last act giving rise to a valid contract, SCB's payment of premium, occurred in Illinois. St. ¶ 9. The places bearing a rational relationship to the contract are Illinois and the District of Columbia. *See* ECF 39 at 11. However, the District of Columbia's *only* contact with the contract is that the insured risk is located there. By contrast, Illinois has the overwhelming majority of contacts with the Policy—that is, Illinois has the "most significant contacts" with the contract in question—and Illinois law should therefore govern the construction of that contract.

## II.    Rules of Policy Construction

Illinois law requires the liberal construction of insurance policies in favor of coverage. *DeSaga*, 910 N.E.2d at 163. The court "give[s] the terms of an unambiguous insurance policy their plain and ordinary meaning, reading the policy as a whole and considering the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 952 (7th Cir. 2020) . However, if the language of the policy is subject to more than one reasonable interpretation, "an ambiguity exists which must be resolved in favor of coverage." *FDIC v. Am. Cas. Co.*, 998 F.2d at 408 (Illinois law); *accord Chase*, 780 A.2d at 1127 ("[I]f [the policy's] language is reasonably open to two constructions, the one most favorable to the insured will be adopted.") (quotation omitted) (D.C. law). "[T]he insured's interpretation of [the] unclear provision must prevail in order to effectuate the

4

predominate purpose of the contract which is to indemnify the insured." *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir.1987) (citations omitted); *see also Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1123 (7th Cir. 1987) ("[T]he court will construe the ambiguity in favor of the insured because the insurer drafted the policy.") (citations omitted); *Chase*, 780 A.2d at 1127 ("Any fair doubt as to the meaning of its own words should be resolved against the insurer.") (quotation omitted). The court applies this rule "most rigorously" when the term purports to exclude coverage. *Playboy Enters., Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir. 1985).

"[I]nsurance policy provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." *Philadelphia Indem. Ins. Co. v. 1801 W. Irving Park, LLC*, No. 11 C 1710, 2012 WL 3482260, at *2 (N.D. Ill. Aug. 13, 2012) (citation omitted); *Johnson Press of Am., Inc. v. N. Ins. Co. of New York*, 791 N.E.2d 1291, 1298 (Ill. App. Ct. 2003) ("Illinois courts will liberally construe any doubts as to coverage in favor of the insured, especially when the insurer seeks to avoid coverage based on an exclusion to the policy.") (citation omitted); *Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 896 (D.C. 2016) (under D.C. law, exclusions from coverage are "strictly construed") (citation omitted). And "it is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Johnson Press*, 791 N.E.2d at 1298; *accord Carlyle*, 131 A.3d at 896-97 ("Where an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception.") (quoting *Cameron v. USAA Property & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C.1999)). The court will apply exclusionary provisions to deny coverage only where the insurer demonstrates that "their terms are clear, definite, and explicit." *Playboy*, 769 F.2d at 428. (citation

omitted); *see Hurst-Rosche Eng'rs, Inc. v. Com. Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995) ("Where, as here, an insurer denies a duty to defend based on an exclusionary clause within a policy, its application must be clear and free from doubt.").

### III.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is a genuine issue as to a material fact if reasonable minds could differ as to that fact." *Simmons v. D.C.*, 750 F. Supp. 2d 36, 38 (D.D.C. 2010) (Lamberth, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)) (internal quotation omitted). A court considering the motion will credit the non-moving party's evidence and draw all reasonable inferences in its favor. *Simmons*, 750 F. Supp. 2d at 38 (citing *Anderson*, 477 U.S. at 255). "Under Illinois law, '[t]he construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.'" *Scottsdale Ins. Co. v. Walsh Constr. Co.*, No. 10 C 1565, 2011 WL 4538456, at *2 (N.D. Ill. Sept. 29, 2011) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1998)).

### ARGUMENT[4]

As demonstrated below, SCB is entitled to summary judgment on Count I of its complaint. First, the Policy, as modified by the LEG 3 extension, unambiguously provides coverage for the damage claimed by SCB, because the workmanship defects in certain pours of concrete used to construct the West Abutment and V-Pier 1s caused a patent detrimental change in the physical condition of the property Lexington agreed to insure (Part I). Second, the bases upon which

---

[4] SCB incorporates its statement of undisputed material facts, cited herein as "St. ¶__."

setting

Lexington denied coverage bear no relationship to the undisputed facts or to the purpose and plain language of the Policy (Part II). And third, drafting errors in the LEG 3 extension render relevant provisions, including the "Perils Excluded" section of the Policy and the LEG 3 extension itself, ambiguous, and any ambiguity must be resolved in favor of SCB (Part III).

## I.      The Policy unambiguously covers repairs to the abutment and V-piers.

Through the Policy, Lexington promised to indemnify SCB "against all risks of direct physical loss of or damage to insured property while at the location of the Insured Project" during the policy term. St. ¶ 12. While the Policy does not define the term "insured property," there is no dispute that the Policy insured SCB's construction of the new Frederick Douglass Memorial Bridge at any stage of completion. St. ¶¶ 13-19. Indeed, John Catania, the Lexington adjuster responsible for handling SCB's claim, acknowledged that "[t]he insured property is the project as … described on the policy" and admitted that "the project is the erection, the construction, of a bridge …." St. ¶ 18; Ex. E at 53:19-24. The Policy expressly provides that even permanent and temporary "works" used to construct various elements of the bridge were covered, right down to the bare materials, supplies, equipment, and auxiliary structures such as scaffolding and formwork.[5] St. ¶¶ 13-15. The essential purpose of the Policy was plainly, by its terms, to protect SCB against loss or damage to any property that could impair the value of its contract to demolish the old bridge and construct a new one.

While the standard form upon which Lexington wrote the Policy excluded coverage for loss or damage caused by "[f]aulty or defective workmanship or materials" (St. ¶ 20), SCB

---

[5] "Formwork" refers to the molds into which concrete is poured in place. St. ¶ 27.

purchased a "LEG 3 Defect Extension," which superseded the original provision (St. ¶ 22) and extended coverage to include loss or damage caused by certain defects.[6] The extension states:

> Perils Excluded, Item C. is deleted and replaced by the following:
>
> All costs rendered necessary by defects of material workmanship, design, plan, or specification and should damage (which for the purposes of this exclusion shall include any patent detrimental change in the physical condition of the Insured Property) occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to improve the original material workmanship design plan or specification.
>
> For the purpose of this policy and not merely this exclusion it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged solely by virtue of the existence of any defect of material workmanship, design, plan, or specification.

St. ¶ 23.

The language of the LEG 3 extension is convoluted. But when unwound, its meaning is clear: The extension provides coverage for the repair or replacement of damage to insured property by *narrowing the scope* of the original Policy's wholesale exclusion for damage caused by workmanship defects. Under the LEG 3 extension, where insured property is damaged and the damage is caused by a defect in workmanship, *only* "the cost incurred to *improve* the original … workmanship" is excluded from coverage. St. ¶ 23; Ex. D at 39 (emphasis added). The extension also provides that insured property shall not be considered damaged solely because it contains latent defects in materials, workmanship, design, plan or specification. Rather, to be damaged

---

[6] The LEG 3 extension purports to "delete and replace" only Item C within the "Perils Excluded" section of the Policy. St. ¶ 23. However, in substance, it encompasses the subject matter of both Item B ("[f]aulty or defective workmanship or materials") *and* Item C ("[f]ault, defect, error, deficiency or omission in design, plan or specification"). St. ¶ 20. Thus, it appears that Lexington made a scrivener's error and the parties intended for the LEG 3 extension to supersede both Items B and C. If this inconsistency was not an error, it renders the Policy ambiguous as to coverage for defects in workmanship or materials, which requires a ruling in SCB's favor, as discussed in Part III, below.

within the meaning of the Policy, any insured property containing defects must exhibit a "patent detrimental change" in its physical condition. *Id*.

Here, the relevant facts are beyond dispute. The Policy insured the new bridge while under construction, including even the bare materials and temporary structures (e.g., scaffolding) used by SCB in the construction. St. ¶¶ 12-18. To construct certain load-bearing elements of the bridge, namely the West Abutment and North and South V-Pier 1s, SCB used various materials and supplies, including concrete, steel rebar and formwork. St. ¶ 27. When SCB began the series of concrete pours giving rise to its claim, several portions of those load-bearing elements had already been constructed and were in use, bearing the weight of the bridge. St. ¶ 29. Due to the magnitude of the structure, the concrete pours, or "placements," were done successively, gradually adding on to the single, continuous structure comprising the abutment and piers. St. ¶ 30. SCB's construction process entailed pouring concrete into the formwork and waiting for the concrete to cure before moving on to the next placement. *Id*. Within the concrete, supporting structures—such as reinforcing steel (rebar) and pipe piles—were continuous from one pour through the next, all the way down to the bridge's footing. St. ¶ 31.

Inadequate vibration, a workmanship defect, occurred in one stage of the pours, affecting the abutment and V-piers at issue. St. ¶¶ 32, 38. The inadequate vibration caused substantial voids in the concrete appended to previously existing, and load-bearing, structures, which rendered the West Abutment, North and South V-Pier 1s *as a whole* unfit to bear the weight of the bridge. St. ¶¶ 34-35. Thus, the West Abutment and V-Piers (insured property) suffered damage (a patent detrimental change in condition) in the form of concrete voiding, resulting in the loss of their ability to bear the weight of the bridge. This extensive damage required repair and caused SCB to incur expenses in excess of $2.2 million. St. ¶ 39. SCB timely submitted its claim to Lexington

9

and cooperated with the insurer's investigation—these facts, too, are beyond dispute. St. ¶¶ 36-37, 41. As a result, SCB is entitled to judgment as a matter of law on its contract claim.

## II.    Lexington's coverage position is unmoored from the plain language of the LEG 3 extension, the purpose of the Policy and the facts.

The purpose of the builder's risk policy purchased by SCB is apparent on its face. The Policy is a "completed value" builder's risk policy, through which Lexington agreed to indemnify SCB against loss or damage to the insured project (i.e., the new Frederick Douglass Memorial Bridge that SCB was contractually obligated to complete), including the materials, scaffolding and formwork used to complete the project. St. ¶¶ 12-18. Notably, SCB's premium was calculated based on the completed value of the insured project, $482,286,002. St. ¶ 19. The purpose of the Policy, then, was to insure against the risk of loss or damage to the new bridge *prior to its completion*, to ensure that SCB obtained the full value of its contract to build the new bridge. In turn, the purpose of the LEG 3 extension was to "extend," or add to, the coverage available under the original policy form, which would have barred coverage for any loss or damage caused by defects in workmanship. Importantly, the LEG 3 extension is titled "LEG 3 ***Defect Extension***" (emphasis added) and was sold as an endorsement to supplement the coverage available under the Policy. St. ¶ 21-23. This evinces the parties' intent to *extend* coverage under the Policy to *defects* in workmanship, design and the like causing damage to ("a patent detrimental change in") the insured property. By its terms, the LEG 3 extension—including its express reference to defects in workmanship—provides coverage for the repair and remediation of damage caused by workmanship defects, but not the cost of *improving* the workmanship that caused the damage.[7]

---

[7] SCB's claim does not include the cost of such improvements. *See* St. ¶ 39; Ex. H.

Lexington has denied coverage on two grounds that ignore the express language of the Policy, as broadened by the LEG 3 Defect Extension. Lexington's denial contends that: (1) the visible honeycombing and voids in the final pour of concrete used to construct the West Abutment and V-Pier 1s did not constitute "damage" to the insured property, including because the abutment and V-piers had not been "placed into use" or "incorporated into" the bridge; and (2) the LEG 3 extension bars coverage for "all costs rendered necessary by defects of material workmanship, design, plan, or specification." St. ¶ 43. Those positions are untethered from the facts and inconsistent with the plain language and intent of the Policy, as modified by the LEG 3 extension.

First, Lexington asserts that the defects in certain concrete appended to the existing West Abutment and V-Pier structures, which were "continuously" connected and comprised a single structure (St. ¶¶ 30-31), did not result in physical damage to the abutment or V-piers. Specifically, Lexington contends that the "defective abutments and V-piers were never incorporated into any other portion of the Bridge," and therefore the flawed concrete pour could not have caused damage to insured property. St. ¶ 43; Ex. I at 4-5. That position ignores the facts and the language of the Policy. Lexington did not agree to insure "the Bridge" at completion or at some specified stage of completion. Rather, Lexington agreed to insure the project as a whole, at any stage of completion, right down to the bare materials and temporary supporting structures used to construct the new bridge. Nowhere does the Policy state that, to be covered, the affected part of the bridge must be "placed into use" or "incorporated into" some other portion of the bridge. And, even if it did, the undisputed facts establish that the concrete *was*, in fact, poured atop other structural elements of the West Abutment, all of which were internally connected and "continuous" components of the bridge as a whole. St. ¶¶ 30-31. It is also undisputed that the in-process abutment "at that point in time … was loaded up and doing its job" (i.e., "carrying the dead load of the bridge"). St. ¶ 29;

Ex. F at 55:1-21. Repairs to the defective concrete rendered the abutment unable to bear the weight of the bridge, as it had been before. St. ¶ 34; Ex. F at 55:1-21. Thus, contrary to Lexington's assertion, there was, in the parlance of the LEG 3 extension, a "patent detrimental change in" the physical condition of the abutment and V-piers.

Second, Lexington's denial rests on the contention that "[t]he LEG 3 Extension precludes coverage for costs rendered necessary by defects in workmanship." St. ¶ 43. That assertion ignores the express language of the LEG 3 extension. Under the heading "Perils Excluded," the original coverage form bars coverage for loss, damage or expense caused directly or indirectly by "[f]aulty or defective workmanship or materials"—full stop. St. ¶ 20. However, the LEG 3 Defect Extension supersedes that provision and extends coverage to include damage to portions of the insured property affected by defective workmanship. *See Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 447 (7th Cir. 2022) (under Illinois law, where policy and endorsement conflict, the endorsement prevails).  Under the LEG 3 extension, where defects in workmanship result in a "patent detrimental change in the physical condition of the Insured Property," the damage is covered. St. ¶¶ 22-23. As discussed above, the LEG 3 extension narrows the scope of the exclusion, and yet, Lexington attempts to wish away the extension entirely. That attempt fails. *See Mkt. St. Bancshares*, 962 F.3d at 954–55 ("Illinois law commands that … meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary[.]") (citing *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 304 Ill.App.3d 153, 709 N.E.2d 249, 253 (1999)) (internal quotation omitted).

III.    **The LEG 3 extension renders the Policy ambiguous, which requires a finding in favor of SCB.**

Under Illinois and D.C. law, language in an insurance policy that is subject to more than one reasonable interpretation is ambiguous. *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19

F.4th 1002, 1006 (7th Cir. 2021) ("Ambiguity exists if the language of the policy is subject to more than one reasonable interpretation as applied to the dispute before the court.") (citing *Founders Ins. Co. v. Munoz*, 237 Ill.2d 424, 433, 930 N.E.2d 999, 1004 (2010)); *Chase*, 780 A.2d at 1127-28 (policy language is ambiguous if "it is susceptible of more than one reasonable interpretation") (quotation omitted). An ambiguous policy provision must be construed in favor of coverage. *Zurich*, 815 F.2d at 1123; *Chase*, 780 A.2d at 1127. As the Illinois Supreme Court has explained:

> Where competing reasonable interpretations of a policy exist, a court is not permitted to choose which interpretation it will follow. … Rather, in such circumstances, the court must construe the policy in favor of the insured and against the insurer that drafted the policy. … Since [the insurer's] interpretation affords less coverage to [the insured], we would be required to reject it.

*Emps. Ins. of Wausau v. Ehlco Liquidating Tr.*, 186 Ill.2d 127, 141-42, 708 N.E.2d 1122, 1130 (1999) (citations omitted).

Here, the plain language of the Policy, read "as a whole and considering the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract" (*Mkt. St. Bancshares*, 962 F.3d at 952), unambiguously provides coverage for the damage claimed by SCB, as discussed above. However, the imprecise drafting of the LEG 3 extension creates ambiguity in relevant provisions of the Policy. First, the language of the LEG 3 extension itself is ambiguous. The extension refers to "Insured Property" as a defined term (*see* St. ¶ 23), yet the remainder of the Policy does not define or use that term, instead using the terms "insured property" (lowercase) and "property insured" interchangeably (*see* Ex. D *passim*). To the extent the parties now differ as to which property or portions of the bridge are covered—with Lexington asserting that, to be covered, an element of the bridge must be "placed into use" or "incorporated into non-defective components of the Bridge" (St. ¶ 43), qualifications that are not found *anywhere* in the

body of the Policy or its endorsements—SCB's interpretation of the scope of coverage under the LEG 3 extension must prevail.

Additionally, the inexact manner in which Lexington drafted the LEG 3 extension creates ambiguity within the "Perils Excluded" section of the Policy, upon which Lexington relies. Specifically, items B and C of that section bar coverage for loss, damage or expense caused directly or indirectly by "[f]aulty or defective workmanship or materials …" (Item B) or "[f]ault, defect, error, deficiency or omission in design, plan or specification …" (Item C). St. ¶ 20. The LEG 3 extension then states: "Perils Excluded, Item C. is *deleted and replaced by* the following: All costs rendered necessary by defects of material workmanship, design, plan, or specification …." St. ¶ 23 (emphasis supplied). That is, while the LEG 3 extension purports to replace only Item C, the substantive terms of the extension refer to both "defects of material [and] workmanship" (Item B) *and* "defects of … design, plan, or specification" (Item C).

The resulting ambiguity is material, as SCB seeks coverage for damage to the abutment and V-piers resulting from defects in workmanship. Yet, which version of the exclusion applies— the wholesale bar to coverage under Item B as it appears in the original coverage form, or the modified (narrower) exclusion for latent defects under the LEG 3 extension? The answer is unclear. And under both Illinois and D.C. law, the ambiguity must be resolved in SCB's favor to "effectuate the predominate purpose of the contract which is to indemnify the insured." *Karaganis*, 811 F.2d at 361; *Smalls*, 678 A.2d at 35 (court will interpret "any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy"). Thus, the imprecise way in which Lexington drafted the exclusions and limitations in its Policy entitles SCB to judgment as a matter of law. *See Panfil v. Nautilus Ins. Co*., 799 F.3d 716, 721 (2015) ("What the policy gives in one exclusion, it takes away in the next. The two provisions conflict, so there

is an ambiguity which is resolved in favor of JRJ.") (citations omitted). Moreover, Illinois law *requires* that where an endorsement and the Policy conflict, the language of the endorsement controls. *See Liberty Mutual*, 33 F.4th at 447. Here, the language of the LEG 3 Defect Extension that Lexington sold to SCB provides coverage for repair and replacement costs necessitated by patent detrimental changes in the physical condition of the insured property—the bridge under construction—resulting from defects in workmanship.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of SCB as to Lexington's liability on Count I of the complaint and set an evidentiary hearing on the issue of damages.

Dated: September 15, 2022                 Respectfully submitted,

SOUTH CAPITOL BRIDGEBUILDERS

/s/ *David B. Goodman*

David B. Goodman (Bar ID IL0081)
dg@glgchicago.com
Carrie E. Davenport
cd@glgchicago.com
Kalli K. Nies
kn@glgchicago.com
GOODMAN LAW GROUP | Chicago
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
T: 312-626-1890

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2022, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will send electronic notification to the parties and registered attorneys of record that the document has been filed and is available for viewing and downloading.

/s/ *David B. Goodman*