## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SOUTH CAPITOL BRIDGEBUILDERS** ("SCB"), a joint venture composed of ARCHER WESTERN CONSTRUCTION, LLC and GRANITE CONSTRUCTION COMPANY,

*Plaintiff,*

v.

**LEXINGTON INSURANCE COMPANY**,

*Defendant.*

Case No. 21-cv-1436 (RCL)

## <u>MEMORANDUM OPINION</u>

This diversity case is before the Court on cross-motions for summary judgment and concerns the interpretation of an insurance policy issued by defendant Lexington Insurance Company ("Lexington") to plaintiff South Capitol Bridgebuilders ("SCB"). SCB was hired to build the Frederick Douglas Memorial Bridge and obtained a "builder's risk policy" and endorsements thereto from Lexington. In building and integrating the supportive structures of the bridge, SCB's poor vibration of concrete resulted in construction malformations known as "honeycombing" and "voiding," which harmed the structural integrity of the bridge. As a result, SCB had to replace sizable portions of the bridge's supportive structures. Believing that the insurance agreement provided coverage for those expenses, SCB sought reimbursement. However, Lexington, relying on its interpretation of the insurance policy, refused to pay. SCB then brought this suit seeking damages for breach of contract and bad faith.

1

Before the Court are SCB's Motion for Partial Summary Judgment on the breach of contract claim, ECF No. 66, and Lexington's Cross-Motion for Summary Judgment on the breach of contract claim and on SCB's bad faith claim, ECF No. 68. SCB has not filed for summary judgment on the bad faith claim. Neither party disputes that concrete repair expenses were necessitated by deficiencies in SCB's workmanship. They simply disagree over whether the insurance policy provides coverage—a question of law. Because the material facts are not in dispute, Lexington's liability under the policy is an appropriate question for summary judgment.

Upon consideration of the parties' briefing, the record, and the applicable law, the Court will **GRANT** SCB's motion and **DENY** Lexington's motion.

## I.    BACKGROUND

### A.  The Insurance Policy and The Extension

SCB began building the Frederick Douglass Memorial Bridge in Washington, D.C. in the summer of 2017. Compl. ¶ 22, ECF No. 1.[1] SCB obtained a "completed value builder's risk" insurance policy from Lexington to cover the period from July 13, 2017 to January 1, 2022. *Id.* ¶¶ 2, 13. The Policy agreement insured against "all risks of direct physical loss of or damage to insured property." Exhibit 1, ECF No. 1-1, at 9. The Policy defined "Property Insured" to include "Permanent Works" and "Temporary Works." PSMF ¶ 13. "Permanent Works" included "[a]ll materials, supplies, equipment, machinery, and other property of a similar nature . . . when used

---

[1] Among the documents considered in connection with the pending motion are: Complaint ("Compl."), ECF No. 1; Completed Value Builders Risk Policy ("the Policy"), Exhibit 1, ECF No. 1-1; Plaintiff's Motion for Partial Summary Judgment ("Pl. Mot."), ECF No. 66; Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute ("PSMF"), ECF No. 67-1; Defendant Lexington Insurance Company's Cross-Motion for Summary Judgment ("Def. Mot."), ECF No. 68; Defendant Lexington Insurance Company's Statement of Material Facts as to Which There Is No Genuine Dispute ("DSMF"), ECF No. 68; Defendant Lexington Insurance Company's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute ("DR"), ECF No. 68. Plaintiff's Reply Memorandum in Further Support of Its Motion for Partial Summary Judgment and in Opposition to Lexington's Cross-Motion for Summary Judgment ("PRM"), ECF No. 70; and Defendant Lexington Insurance Company's Reply in Support of Its Cross-Motion for Summary Judgment ("DRM"), ECF No. 72. Other documents were considered but are not cited to in this memorandum opinion.

or to be used in or incidental to the demolition of existing structures, site preparation, fabrication

or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation

of the Insured Project." *Id.* ¶ 14. The Policy defined "Temporary [W]orks" as "[a]ll scaffolding,

form work, fences, shoring, hoarding, falsework, and temporary buildings all incidental to the

project." *Id.* ¶ 15.

Part B(1) of The Policy, entitled "Perils Excluded," explicitly excluded certain items from

coverage under the Policy. Part B(1) states in pertinent part:

> This policy shall not pay for loss, damage or expense caused directly or indirectly by any
> of the following.
> [. . .]
> (B) Faulty or defective workmanship or materials, unless direct physical loss or damage by
> an insured peril ensues and then this policy will cover for such ensuing loss or damage
> only;
>
> (C) Fault, defect, error, deficiency or omission in design, plan or specification, unless direct
> physical loss or damage by an insured peril ensues and then this policy will cover for such
> ensuing loss or damage only;

*Id.* ¶ 20. Multiple terms within these items go undefined in the Policy, including "insured peril,"

"physical loss," and "damage."

The Policy also included endorsements that modified the insurance provided by the Policy.

*See* PSMF ¶ 22. Among these endorsements was the LEG 3 Defect Extension ("the Extension").

*Id.* The Extension explicitly replaced some of the language in the "Perils Excluded" section of the

Policy.[2] *Id.* ¶ 23. The Extension also provided a definition for the word "damage" as used in the

Extension and a limitation on "damage" as used throughout the Policy.

---

[2] Due to a scrivener's error in the endorsement, which the Court will detail more thoroughly in its analysis, the
LEG 3 Defect Extension also *implicitly* replaces other language in Part B(1).

The Extension states in pertinent part:

Perils Excluded, Item C. is deleted and replaced by the following:

All costs rendered necessary by defects of material workmanship, design, plan, or specification and should damage (which for the purposes of this exclusion shall include any patent detrimental change in the physical condition of the Insured Property) occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to improve the original material workmanship design plan or specification.

For the purpose of this policy and not merely this exclusion it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged solely by virtue of the existence of any defect of material workmanship, design, plan, or specification.

All other terms and conditions of the policy remain the same.

*Id.* ¶ 23.

## B. The Bridge Construction, Honeycombing, and Voiding

Before the Court fully delves into the insurance policy construction issues at the core of this case, it must first outline the bridge construction issues that brought the parties to this point.

The design of the Frederick Douglass Memorial Bridge includes cast-in-place concrete substructure elements and a composite deck supported by three consecutive steel arches on each side of the bridge. *Id.* ¶ 24. Those three arches are supported on concrete abutments on the east and west sides of the Anacostia River and two concrete V-shaped piers ("piers") which provide support more towards the center of the river. *See id.* From those three arches, cables are hung which connect the arches to the bridge deck. *See* DSMF ¶ 6. Together, the abutments, piers, and arches work together to support the weight of the bridge. *See id.*

Starting in August and continuing through early September 2019, SCB poured concrete for the bridge's abutments and two piers. Compl. ¶ 24. SCB cast these structures in place using molds called formworks, DSMF ¶ 6. Due to the magnitude of the abutments and piers, concrete was

4

placed in separate pours, or "lifts." *Id.* ¶ 6, 7, 9. SCB completed each abutment in three pours and each pier in four pours. *Id.* ¶ 7, 9. While pouring the lower sections of the abutments and piers, workers stood inside the formwork and vibrated the concrete to ensure even placement. Compl. ¶ 25. These vibrations were necessary to ensure that the concrete reached all areas of the formwork. DSMF ¶ 11. This same process, however, was not feasible during concrete placement at the tips of the abutments and piers. PSMF ¶ 32. As a next-best measure, SCB placed access holes in the side of the tip-section formwork to allow workers to vibrate the concrete. Compl. ¶ 25. However, due to inadequate vibration of concrete during placement, once the concrete dried and workers removed the formwork, SCB observed structural deformities referred to as "honeycombing" and "voiding" in the concrete. *Id.* ¶ 27, 29.

Honeycombing is a structural weakness caused by porosity in concrete. DSMF ¶ 7. Some honeycombing can be relatively minor where concrete simply does not have a "smooth finish." *Id.* This sort of "cosmetic" honeycombing is common and can be repaired by simply "mixing up some cement and sand and smearing it in the holes." *Id.* However, other types of honeycombing can be more deleterious. Significant honeycombing is referred to as "voiding" and can diminish concrete's weightbearing capacity. *See* PSMF ¶ 34. Both minor honeycombing and voiding were observed once SCB removed the formworks on the piers. *Id.*; DSMF ¶ 7, 10. The voiding included holes in the concrete "measuring several feet wide and deep [,] visible to the naked eye." PSMF ¶ 35. Further, the effect of these voids on the structural integrity of the bridge were not merely theoretical. Indeed, SCB maintains—and Lexington does not dispute—that "[a]fter the flawed concrete was appended to the existing load bearing sections of the bridge, the structure was no

longer able to support the weight of the bridge."[3] PSMF ¶ 34; *See* DSMF; Exhibit F, ECF No. 67, at 28 ("[The abutment] could support the dead load of the structure, but it had been damaged to the point it could not support the live load of the next stages of construction."). A consulting service retained by Lexington concluded that the honeycombing was a result of workmanship-related issues, including inadequate vibration during placement, that resulted in poor consolidation of the concrete. Exhibit 2, ECF No. 1-2, at 3. SCB does not dispute this finding.

The honeycombing and voiding required SCB to cease work and undertake repairs. Compl. ¶¶ 27–30. While minor honeycombing was repaired with cosmetic patching, more serious honeycombing and voiding required significant alteration. On the piers, SCB chipped away soft, unsound concrete and replaced it with new concrete. DSMF ¶¶ 7, 10. To repair the voids in the abutments, SCB sawed off the last 17 feet of the abutments and replaced them. *Id.* SCB maintains that the flawed concrete required it to shore the structures to prevent collapse and undertake repairs in excess of $2.2 million; Lexington contests this amount. *See* DR ¶ 1.[4]

### C. Lexington Rejects SCB's Claim for Reimbursement

On October 24, 2019, SCB filed a claim with Lexington seeking reimbursement for the cost of repair. Compl. ¶ 33. Lexington denied coverage once on April 19, 2020, and when SCB requested reconsideration of that determination, Lexington denied coverage once again on May 18, 2020. *Id.* ¶¶ 44, 47. Following those unsuccessful requests for reimbursement, SCB commenced an action alleging breach of contract and bad faith in the U.S. District Court for the

---

[3] Local Rule 7(h)(1) of this Court notes that "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The purpose of the rule is to aid courts in deciding motions for summary judgment by refining the record to focus on disputed factual issues. *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002).

[4] Lexington correctly acknowledges that a damages determination is premature at this juncture. DR ¶ 1. The parties have previously agreed that expert discovery on that issue would follow this threshold determination of coverage. *See* ECF No. 53.

Northern District of Illinois. Compl. ¶ 1. The case was transferred to this Court. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds the jurisdictional minimum. Compl. ¶ 9. SCB moved under Fed. R. Civ. P. 56(a) for partial summary judgment on its breach of contract claim. Pl. Mot. Lexington cross-moved for summary judgment on the breach of contract claim and moved for summary judgment on the bad faith claim. Def. Mot.

## II. LEGAL STANDARD

### A. Applicable Law

Both parties agree that Illinois insurance law governs the Policy agreement. *See* Pl. Mot. at 3; Def. Mot. at 11.[5] In Illinois, interpretation of an insurance policy is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). "In construing the language of [an insurance] policy, the court's primary objective is to ascertain and give effect to the intent of the parties to the contract." *Traveler's Ins. Co. v. Eljier Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001). "In order to ascertain the meaning of the policy's language and the parties' intent, the court must construe the policy as a whole and 'take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.'" *Id.* (quoting *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997)). Indeed, "[a]ll the provisions of the insurance contract, rather than an isolated part, should be read in light of each other to determine whether an ambiguity exists." *F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404,

---

[5] The parties quarrel over the operative choice of law rules. As this Court explained in a previous opinion in this case, Illinois courts engage in choice-of-law analysis only "if there is a conflict between Illinois law and the law of another state such that a difference in law will make a difference in the outcome." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass 'n*, 922 F.3d 827, 831 (7th Cir. 2019) (internal quotation marks and citation omitted); accord *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007). Thus, Lexington correctly asserts that if there was a substantive conflict between Illinois and District of Columbia law in this case, District of Columbia law would apply. Def. Mot. at 11. However, because no such conflict has been demonstrated to exist, Illinois law applies.

408 (7th Cir. 1993) (quoting *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Illinois*, 582 N.E.2d 1257, 1260 (1991)) (internal quotations omitted).

When an insured sues their insurer over a denial of coverage, "the insured has the burden of proving that his loss falls within the terms of his policy." *ABW Dev., LLC v. Cont'l Cas. Co.*, 203 N.E.3d 922, 928 (Ill. 2022). If an insured establishes a prima facie case, the burden shifts to the insurer to demonstrate that the loss resulted from an expressly excluded peril. *Johnson Press of Am., Inc. v. N. Ins. Co. of New York*, 791 N.E.2d 1291, 1298 (2003). Further, "it is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Id.* at 1298.

If the words of a policy are clear and unambiguous, a court must afford them their plain, ordinary, and popular meaning. *Eljier*, 757 N.E.2d at 496. Moreover, courts will not create an ambiguity where there is none. *See id.* at 491. However, if the language of a policy is subject to more than one reasonable interpretation, "an ambiguity exists which must be resolved in favor of coverage." *F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404, 408 (7th Cir. 1993). This rule of strictly construing ambiguous provisions against the insurer is "most rigorously" applicable to "ambiguous exclusionary provisions in which the insurer seeks to limit its liability." *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir. 1985). Thus, exclusionary provisions are applied to deny the insured coverage only where their terms are "clear definite, and explicit." *Id.*

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).[6] A fact is material when it "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of "identifying those portions of the record it believes 'demonstrate the absence of a genuine issue of material fact.'" *White v. Wash. Nursing Facility*, 206 F. Supp. 3d 137, 143 (D.D.C. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once the movant has made an "adequate showing that a fact cannot be disputed, the burden then shifts to the party opposing summary judgment to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). Summary judgment is also proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322).

A party asserting that a fact cannot be genuinely disputed, or that a fact is genuinely disputed, must support that assertion by either (a) "citing to particular parts of materials in the record," or (b) "showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). The party opposing summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue

---

[6] The Court notes that this case comes on cross-motions for summary judgment. In effect, the parties have agreed that only questions of law are involved and invited the Court to decide the issues based on the record.

for trial." *Anderson*, 477 U.S. at 248. Finally, in assessing summary judgment, a court may not

make credibility determinations or weigh evidence. *Id.* at 255.

## III. DISCUSSION

### A. The Damage Alleged by SCB is Unambiguously Within the Scope of Coverage

To prove that Lexington breached the Policy, SCB must first meet its prima facie burden

of establishing coverage for its claim. *Johnson Press of Am., Inc. v. N. Ins. Co. of New York*, 791

N.E.2d 1291, 1298 (Ill. App. Ct. 2003). SCB clears this hurdle. The "completed value builder's

risk" policy that Lexington issued SCB insured against "all risks of direct physical loss of or

damage to insured property." Exhibit 1, ECF No. 1-1, at 9. There is no dispute that the Policy

insured the piers and abutments. PSMF ¶ 25, Def. Mot. at 19 ("SCB contends that the Bridge V-

Piers [sic] and abutments constitute 'insured property' under the policy, a proposition with which

Lexington does not quarrel."). The sole disagreement on the issue of coverage is whether "damage"

is properly understood to include the costs of fixing the concrete flaws that weakened the bridge.

The answer is unambiguously yes.

"Damage," as used in the Policy's coverage provision, encompasses SCB's claim for

reimbursement. *See F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404, 408 (7th Cir. 1993).

As a preliminary matter, the term "damage" goes undefined in the body of the Policy. Thus, the

Court must turn to the plain, ordinary, and popular meaning of term. *Traveler's Ins. Co. v. Eljier

Mfg., Inc.*,757 N.E.2d 481, 496 (Ill. 2001). Damage is defined as "loss or injury to person or

property" or "any bad effect on something." *Damage*, Black's Law Dictionary (10th ed. 2014). On

the undisputed facts, SCB's inadequate vibration caused a *decrease* in the weightbearing capacity

of the bridge and its support structures. PSMF ¶ 34. A decreased weightbearing capacity is surely

an injury, or at the very least a bad effect, on the bridge and its support structures.

The Court's assessment of the meaning of "damage" need not end with the dictionary. Under Illinois law, to determine ambiguity, the court looks not merely to an "isolated part" but rather to "[a]ll the provisions of the insurance contract." *F.D.I.C.*, 998 F.2d at 408 (7th Cir. 1993) (quoting *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Illinois*, 582 N.E.2d 1257, 1260 ( Ill. App. Ct. 1991)) (internal quotations omitted). While the Court is not determining the applicability of exclusions at this stage, reviewing the "Perils Excluded" section of the Policy alongside the coverage provision provides further evidence that malformities stemming from defects in material workmanship are unambiguously within the scope of coverage. Item B in the "Perils Excluded" section provides a broad exclusion for "loss, damage or expense caused directly or indirectly by . . . [f]aulty or defective workmanship or materials." PSMF ¶ 20. Setting aside the *effect* of this exclusion for the moment, the clear *implication* of Item B is that "faulty or defective workmanship" can cause "loss, damage, or expense"—otherwise this exclusion would not have been necessary.

The LEG 3 Defect Extension similarly suggests that SCB's claim is within the scope of coverage of the Policy. The Court will more thoroughly untangle the tortured language of the Extension at the next stage of the analysis, but the Extension's treatment of the term "damage," which it defines as "patent detrimental change," underscores that issues of defective workmanship can cause damage. PSMF ¶ 23. SCB seems to suggest that "damage" as used here is identical to how "damage" is used in the coverage provision. PRM at 5. But that argument is a bridge too far. Instead, the Extension provides that the word "damage" "*for the purposes of this exclusion* shall include any patent detrimental change in the physical condition of the Insured Property." (emphasis added). While the definition in the Extension may shed light on the scope of "damage" as used in the coverage provision, prefatory language in the Extension's damage definition

suggests that it is not necessarily used the same way as "damage" in the coverage provision. This is made more evident by the penultimate sentence of the Extension which says:

> *For the purpose of this policy and not merely this exclusion* it is understood and agreed that any portion of the Insured Property shall not be regarded as damaged *solely by virtue* of the existence of any defect of material workmanship, design, plan, or specification.

PSMF ¶23 (emphasis added). On another note, Lexington argues that this part of the Extension defines "damage" in a way that conclusively excludes defects caused by material workmanship. Def. Mot. at 18–19. But "caused by" and "solely by virtue of the existence" are not the same. The Extension does not suggest that property cannot be "damaged" if there were defects in material workmanship somewhere in the causal chain. Instead, it indicates that defects of material workmanship *in and of themselves* are insufficient to constitute damage. SCB does not seek reimbursement *solely* for its defective workmanship. On the undisputed facts, SCB's defective workmanship led to honeycombing and voiding, which in turn led to decreased structural integrity of the bridge. Thus, Lexington's arguments are unavailing.

Finally, in assessing the meaning of "damage," the Court must consider the "parties' intent" and the "overall purpose of the contract." *Traveler's Ins. Co. v. Eljier Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001). SCB purchased an "all risk" insurance policy for the construction of a bridge. Exhibit 1, ECF No. 1-1, at 9. One such risk, inherent in any complex construction project, is damage from errors of workmanship. The record evidence suggests that Lexington was aware that it was agreeing to insure issues that arose during the construction of the bridge. Indeed, John Catania, the Lexington adjuster responsible for handling SCB's claim indicated as much in his deposition. *See* Exhibit E, ECF No. 67-6, Catania Dep. 79:10–70:11. ("[W]e didn't insure a bridge. We insured the building of the bridge."). The plain language of the coverage provision, the policy

12

as a whole, and the intent of the parties suggest that structural damage stemming from SCB's defective workmanship is within the scope of coverage.

**B. Lexington's Case Law Fails to Establish that the Damage Alleged by SCB is Not Covered.**

Lexington argues that Illinois law definitively establishes that insured property must be *altered*, not merely defectively constructed, in order to constituted "physical loss" or "damage." Def. Mot. at 19. Lexington further asserts that no insured property was *altered* because the honeycombed concrete components were defective "from the time [they] were made." *Id.* The concrete components did not *become* defective, says Lexington, but rather were defective from the moment the concrete dried and the components became fabricated. Additionally, Lexington argues that the incorporation of defective components into a larger project does not constitute damage under Illinois law. Def. Mot. at 23.

The Court finds Lexington's argument unpersuasive for two reasons. For starters, a change that results in a reduction in the weightbearing capacity of a bridge *is* an "alteration" to that bridge. Second, even if this were not so, Lexington's authorities are inapposite. In the span of a few pages, Lexington cites nearly two dozen cases in its argument that SCB's claim is not covered by the Policy. Def. Mot. at 12–16. The Court has reviewed each of them. Lexington's cases, while perhaps impressive in quantity, are wanting in relevance. The Court will not endeavor to march through every individual case here, as many of these cases are inapposite for the same reason. Indeed, grouping these cases makes clear how each is distinguishable. Lexington's litany of authorities falls neatly into three buckets.

First, Lexington cites several cases in which businesses sought reimbursement from their insurers for the loss of the use of their property following COVID-19 closure orders. *Id.*; *see, e.g.*, *ABW Dev., LLC v. Cont'l Cas. Co.*, 203 N.E.3d 922, 928 (Ill. 2022). None of these cases involved

13

construction, bridges, workmanship defects, or anything of the sort. Instead, these are cases where courts held that businesses could not recover for economic losses stemming from their inability to operate during the closures because neither the virus nor the corresponding shutdowns constituted "physical loss" or "damage" under those policies. *Id.* To state the obvious, none of these cases are similar to the facts here. Nor do these holdings require, as Lexington claims, that the terms used in SCB's Policy be construed to exclude coverage for repairing and replacing flawed concrete that caused structural weakness. Even worse, a closer examination of these cases reveals that they *undermine* Lexington's argument. For example, in *Rose's 1 LLC*, the court held that a governmental edict alone could not constitute a direct physical loss under an insurance policy because there was no "compromise to the physical integrity" of the property insured in that case. *Rose's 1, LLC v. Erie Ins. Exchange*, No. 2020-CA-002424, 2020 WL 4589206, at *3 (D.C. Super. August 6, 2020). Once again, Lexington does not persuasively articulate how a reduction in the weightbearing capacity of the bridge is anything other than a "compromise to [its] physical integrity."

The Court now turns to Lexington's second batch of authorities. Lexington cites a slew of cases in which businesses were sued by third parties for issues stemming from defective manufacturing and construction. Def. Mot. 12, 14–16; *See, e.g.*, *Traveler's Ins. Co. v. Eljier Mfg., Inc.*,757 N.E.2d 481, 491 (Ill. 2001). In each of these cases the businesses sought to recover from their insurers. Lexington relies on these cases to argue that "damage" does not include repair and replacement costs stemming from the creation or incorporation of defective parts. The main holding of these cases is that costs of repairs are regarded as "economic injuries" that do not trigger coverage for physical loss or damage. Def. Mot. at 23. To be sure, these cases bear a closer resemblance to this case than Lexington's pandemic-loss precedents. Further, these cases recite

14

some generally applicable principles of Illinois insurance law. However, they are nonetheless inapposite for Lexington's purpose.

Lexington relies principally on the Illinois Supreme Court's decision in *Eljier*. The plaintiff in that case was the parent company to a manufacturer of residential plumbing systems. *Eljier,* 757 N.E.2d at 486. The plaintiff's subsidiary purchased comprehensive general liability insurance policies from the defendant, which covered "physical injury to or destruction of tangible property." *Id.* at 488. Eventually, the plaintiff's plumbing systems began to leak, and the plaintiff faced tens of thousands of lawsuits, some of which demanded damages for the cost of repairing or replacing the faulty plumbing. *Id.* The plaintiff sought a declaratory judgment that its insurance company would indemnify it for the cost of repairing or replacing the bad plumbing. *Id.* The Illinois Supreme Court said no: coverage for physical injury "is not triggered by purely economic losses, such as damages for inadequate value, costs of repair or replacement, and diminution of value that result from a product's inferior quality or its failure to perform for the general purposes for which it was manufactured and sold." *Id.* at 502 (cleaned up) (emphasis added). Lexington argues that under *Eljier* and similar Illinois cases, the cost of repair is an economic loss that does not trigger coverage for physical injury.

However, the insurance policies in *Eljier* and its kin were Commercial General Liability (CGL) policies—distinct from the "builder's risk policy" that SCB purchased. *Id.* at 488. This difference is critical. CGL policies are intended to insure against "the possibility that the goods, products or work of the insured, *once relinquished or completed*, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." *Diamond State Ins. Co. v. Chester-Jensen Co., Inc.*, 611 N.E.2d 1083, 1091 (Ill. App. Ct. 1993) (quoting Roger C. Henderson, *Insurance Protection for Products Liability and*

*Completed Operations—What Every Lawyer Should Know*, 50 NEB. L. REV. 415, 441 (1971)) (emphasis added). In this way, Illinois law makes clear that the purpose of CGL policies is "to provide coverage for injury or damage to the person or property *of others*; they are not intended to pay the costs of repairing and replacing the insured's defective work and products." *Viking Const. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 13 (Ill. App. Ct. 2005) (quoting *Pekin Ins. Co. v. Richard Marker Assocs., Inc.*, 682 N.E.2d 362, 365 (Ill. App. Ct. 1997)) (emphasis added). As a result, "when the underlying complaint alleges only damage to the structure itself, courts have found that there was no coverage." *Pekin Ins. Co.*, 682 N.E.2d 362, 365 (1997). By contrast, the policy at issue in this case undoubtedly provides coverage for damage to the bridge's structures, whether permanent or temporary, during construction. PSMF ¶ 13-15. In this way, the CGL policies in these cases differ drastically from the builder's risk policy purchased by SCB.

SCB correctly argues that this difference is fatal to Lexington's reliance on this line of cases to deny coverage. PRM at 9. Even so, Lexington maintains that its CGL precedent should be dispositive, arguing that SCB has "no principled basis for construing the same words differently under different types of insurance policies." DRM at 4. Of course, the precise opposite is true. Under Illinois law, it is firmly established that "the *type of insurance* purchased" is a critical consideration in determining the meaning of the terms in an insurance policy. *Traveler's Ins. Co. v. Eljier Mfg., Inc.*,757 N.E.2d 481, 491 (Ill. 2001).

Finally, in a footnote, Lexington cites a half-dozen cases—none of which interpret Illinois law—to argue that "damage" in builder's risk insurance contracts requires some "initial satisfactory state" or otherwise precludes recovery for defective construction. Def. Mot. at 24. Lexington does not bother to explain how these nonbinding cases are analogous or why the court should consider them persuasive. *Id*. Moreover, the larger issue with this bucket of cases is an

issue applicable to all of the cases that Lexington cites: the agreement in this case is simply different. Full stop. No case Lexington cites involves a similar construction project or a similar insurance policy that was similarly modified. The Court must give effect to the intent of *the parties before it* in construing an insurance policy. *Traveler's Ins. Co. v. Eljier Mfg., Inc.*,757 N.E.2d 481, 491 (Ill. 2001). Even if it were the case that some other analogous policies have defined damage differently—which Lexington has not demonstrated—Lexington would at best be able demonstrate an ambiguity, which would still be resolved in favor of coverage. *F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404, 408 (7th Cir. 1993).

### C. Lexington Fails to Demonstrate that an Exclusion is Applicable

Given that SCB has established coverage under the Policy, Lexington has the burden of demonstrating that an exclusion applies. Lexington relies on the LEG 3 Defect Extension to do so. Def. Mot. at 27. SCB argues that the language of the Extension unambiguously supports coverage. Pl. Mot. at 8. Lexington counters that it unambiguously excludes coverage. Def. Mot. at 27. Neither party is correct. The LEG 3 Extension is ambiguous—egregiously so. To understand this, one need only attempt to read it. In just three sentences, Lexington managed to squeeze in a run-on sentence, an undefined term, several mispunctuations, and a scrivener's error.[7] Exhibit 1, ECF No. 1-1, at 39. The Extension is internally inconsistent and bordering incomprehensible. SCB's statement that the Extension is "convoluted" is an understatement. Pl. Mot. at 8. Nonetheless, the Court will endeavor to sort it out by breaking it down piece by piece.

The parties' first disagreement on the Extension begins with its title: "LEG 3 Defect Extension." More specifically, they disagree over whether the provision is in fact an extension at

---

[7] Despite being capitalized, "Insured Property" is not defined in the Extension. Exhibit 1, ECF No. 1-1, at 39. However, the slightly different "Property Insured" is defined in the body of the policy. Exhibit 1, ECF No. 1-1, at 9. While this contributes to the ambiguity of the Extension, the Court sees no reason to treat the two terms differently.

all. Lexington argues that the provision is really an exclusion because it was meant to delete and replace portions of the "Perils Excluded" section of the Policy. PRM at 6; DRM at 6. SCB argues that the provision actually operates as an extension of coverage under the Policy. PRM at 6; DRM at 6–7. But of course, two things can be true at once. Yes, the LEG 3 Extension is an exclusion— it even refers to itself as one. Exhibit 1, ECF No. 1-1, at 39 (including "for the purposes of this exclusion"). However, in replacing a broad exclusion from coverage with a narrower exclusion, the endorsement *functionally extends* what SCB is entitled recover for. *Id.* Unfortunately, exactly which previously operative exclusion, or exclusions, the Extension replaced is the next area of confusion.

The plain text of the LEG 3 Extension only purports to replace one section of the Policy's exclusions: "Perils Excluded, Item C." Exhibit 1, ECF No. 1-1, at 39. However, SCB correctly notes that, in substance, the Extension encompasses the subject matter of both Item B *and* Item C. Pl. Mot. at 8. Indeed, Item B excludes coverage for issues related to "[f]aulty or defective workmanship or materials," and Item C excludes coverage for issues related to "[f]ault, defect, error, deficiency or omission in design, plan or specification." Collectively, those provisions contained the Policy's exclusions for claims associated with errors in SCB's work—precisely what the Extension covers. As a result, SCB's motion for summary judgment argued that "it appears that Lexington made a scrivener's error and the parties intended for LEG 3 extension to supersede both Items B and C." Pl. Mot. at 8. Lexington responded with the following: "SCB states that the LEG 3 extension is ambiguous and should be read as replacing both Exclusion B and Exclusion C . . . but that resolving that question is not necessary to these motions." Def. Mot. at 11. To be sure, resolving the question of whether the Extension is ambiguous is critical to resolving these motions. Thus, the Court rejects Lexington's invitation to ignore the unclear and error-riddled

language of the Extension, which Lexington drafted, signed, and now seeks to rely on to deny coverage.

Additionally, the Court is curious as to why Lexington referred to the presence of the scrivener's error in the LEG 3 Extension as a "question" that need not be "resolved" in its cross-motion for summary judgment, but then turned around and proclaimed that "Lexington has acknowledged in this case that there is a scrivener's error in the Policy's LEG 3 endorsement." *Id.*; DR at 2. In feigning ignorance of the scrivener's error, Lexington implied that it may or may not be there. Def. Mot. at 11. By playing this game of Schrödinger's typo, Lexington obscured the issues and wasted this Court's time. While a scrivener's error is not dispositive of the existence of ambiguity in a contract provision, when viewed in light of the morass that is the LEG 3 Extension, this additional error reinforces this Court's conclusion that the text of the Extension is far from "clear, definite, and explicit." *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir. 1985).

Next the Court turns to the meat of the Extension, which excludes from coverage:

All costs rendered necessary by defects of material workmanship, design, plan, or specification and should damage (which for the purposes of this exclusion shall include any patent detrimental change in the physical condition of the Insured Property) occur to any portion of the Insured Property containing any of the said defects, the cost of replacement or rectification which is hereby excluded is that cost incurred to improve the original material workmanship design plan or specification.

Exhibit 1, ECF 1-1, at 39. Both parties acknowledge that the Extension begins by generally precluding recovery for defects in material workmanship. Def. Mot. at 20; *See* Pl. Mot. at 8. And both parties agree that nested within the exclusion is some exception for instances in which there is "damage"—a "patent detrimental change in the condition of the insured property." Def. Mot. at 20; Pl. Mot. at 8. Thus, the actual disagreement is two-pronged: (1) on the facts of this case, did

SCB's claim describe damage, and (2) what exactly is the scope of the exception to exclusion if damage is established? The Court takes these two disagreements in turn.

First, the Court holds that "damage" as used in the LEG 3 Extension unambiguously encompasses SCB's claim. Once again, the honeycombing and voiding resulted in a reduction in the weightbearing capacity of the bridge. This qualifies as a "detrimental change in the condition of the insured property." Moreover, that change is "patent." Patent is defined as "[o]bvious; apparent." *Patent*, Black's Law Dictionary (10th ed. 2014). In addition to causing a decrease in the structural integrity of the bridge and its parts, the honeycombing and voiding were several feet long, deep, and visible to the naked eye. PSMF ¶ 35. Thus, it was undoubtedly obvious or apparent that there was a detrimental change in condition. Perhaps Lexington could argue that the minor honeycombing, which is considered "common" and cosmetic," could not qualify as "patent," but Lexington never makes this argument. DSMF ¶7.

With damage established, the Court now turns to the scope of the exception to this exclusion. The Extension excludes replacement or rectification of costs incurred to "improve" the original workmanship. Exhibit 1, ECF 1-1, at 39. But what does it mean to "improve" the original workmanship? SCB seems to suggest this means making it better than originally planned. *See* Pl. Mot. 8. Thus, if SCB decided to replace the defective concrete with solid gold, or otherwise upgrade it, SCB could not then seek reimbursement of those enhancements. By contrast, under Lexington's view, simply patching or replacing defective components constitutes an improvement. DRM at 8. After all, if something broken gets fixed, hasn't that thing been improved? This argument has intuitive appeal but falls apart upon closer scrutiny. Sure, repairing or replacing a defective component can technically be considered an improvement—unless that component is replaced with something worse. However, the context of the Extension suggests that to improve

means to make a thing *better* than it would have been if it were not for defective work. In fact, the Extension explicitly distinguishes the "cost incurred to improve" work from "the cost of replacement or rectification." Lexington's suggestion that the two are coextensive is unavailing.

At bottom, the LEG 3 Defect Extension is subject to more than one reasonable interpretation and is therefore ambiguous. To be sure, SCB's reading is more plausible. Nonetheless, Lexington's argument—while far from convincing—meets the low bar of being reasonable in light of the mishmash of terms that comprise the LEG 3 Extension. As a result, the Court holds that the Extension is ambiguous as to whether it excludes coverage. Thus, under Illinois law, the Court must construe the Extension against its drafter, Lexington, and in favor of coverage. *F.D.I.C. v. Am. Cas. Co. of Reading, Pa.*, 998 F.2d 404, 408 (7th Cir. 1993). Because the Extension does not exclude coverage for SCB's claim for reimbursement, this Court holds that Lexington is liable for breaching the Policy.

### D. Summary Judgment on SCB's Bad Faith Claim is Inappropriate

SCB also sues Lexington on a claim of bad faith. Compl. ¶ 23. By Illinois statute, an insurance company acts in bad faith if it acts vexatiously or unreasonably in settling a claim. *See* 215 Ill. Comp. Stat. Ann. 5/155. "Whether the insurer's acts are 'unreasonable and vexatious' within the meaning of section 155 is a question of fact, which is discretionary with the trial court." *Green v. Int'l Ins. Co.*, 605 N.E.2d 1125, 1129 (Ill App. Ct. 1992). No single factor in this analysis is dispositive as the court must examine the "attitude of the defendant" in light of the totality of circumstances. *Id.* SCB has not filed for summary judgment on the issue of bad faith, nor have the parties fully briefed the Court on the facts relevant to SCB's bad faith claim. Lexington argues that because there is no coverage, the Court should grant summary judgment in its favor on the bad faith claim. Def. Mot. at 21–22. However, this Court just held that Lexington is wrong; there

decidedly *is* coverage. As a result, summary judgment on the bad faith claim is not presently appropriate.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** SCB's motion for summary judgment and **DENY** Lexington's cross-motion for summary judgment.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: September 29, 2023

Royce C. Lamberth
United States District Judge